UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAKE CHARLES DIVISION

| | |
|---|---|
| **BENOIT FORD L L C ET AL** | **CASE NO.  2:22-CV-06024** |
| **VERSUS** | **JUDGE JAMES D. CAIN, JR.** |
| **LEXINGTON INSURANCE CO ET AL** | **MAGISTRATE JUDGE KAY** |

## MEMORANDUM RULING

Before the Court is "Allied World Specialty Insurance Company's Motion to Dismiss" (Doc. 27), wherein mover seeks to dismiss the claims made by Plaintiffs Benoit Ford, LLC and Benoit Nissan, LLC (collectively referred to as "Benoit") against them for failure to state a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. Subsequently, Benoit filed a Motion for Leave to File First Amended and Supplemental Complaint,"[1] which has now been granted.[2]  As such, the Court will address the instant Motion as it pertains to Benoit's First Amended and Supplemental Complaint ("First Amended Complaint").

## INTRODUCTION

In the First Amended Complaint, Benoit seeks coverage damages and attorney fees, statutory penalties, costs, and interest for losses associated with the theft of vehicles from Benoit under an insurance policy issued by the carriers (Defendants, Lexington Insurance Company, North American Capacity Insurance Company, Peleus Insurance Company, and

---

[1] Doc. 42.
[2] Doc. 55.

Allied Work Specialty Insurance Company) for losses associated with the theft of vehicles from Benoit. Defendant insurer, Allied WorldSpecialty Insurance Company ("Allied World") argues that the claims against it must be dismissed because (1) there is no coverage under the plain language of the Allied World policy and/or (2) the policy expressly excludes coverage.

Benoit owns and operates two car dealerships in DeRidder, Louisiana. In 2020, Benoit developed a touchless purchasing procedure to adapt to the COVID-19 pandemic.[3] Under that process, a prospective buyer could purchase a vehicle online by submitting a credit application to the respective lender. Once the applications were approved, the buyer and Benoit would complete the registration, title, and other paperwork electronically or by overnight mail. When these tasks were completed, the lender would tender the purchase price to Benoit, who would assign the credit agreement to the lender; the buyer would then unilaterally contract with a third-party to arrange transport from the respective dealerships to the buyer.[4] Benoit alleges that this scheme, that misappropriated or stole the Vehicles, was part of an organized outfit.

Between August and October of 2021, Plaintiffs sold the following vehicles through the touchless delivery system:

 a. 2021 Nissan Armada Utility 4D Platinum 5.6L V8 – (8/13/21)
VIN#: JN8AY2DAXM9374617
Purchaser: Christine M Babineau
7 Sequoia Drive
Lunenburg, MA 01482

---

[3] (Doc. 1-2, ¶ 9).
[4] (Doc. 1-2, ¶¶ 9, 10).

b. 2018 Land Rover Range Rover Velar Dynamic SE – (9/8/21)
VIN: SALGS2RE1KA535427
Purchaser: Jason James Rippon
140 Peregrine Lane
Hummelstown, PA 17036

c. 2021 Nissan Armada Utility 4D Platinum 5.6L V8 – (9/20/21)
VIN#: JN8AY2DAXM9374777
Purchaser: Richard James Peterson
565 Worth Street
Corry, PA 16407

d. 2021 Ford F150 Crew Cab Raptor 4WD 3.5L V6 Turbo – (9/20/21)
VIN#: 1FTFW1RG5MFC19358
Purchaser: Richard Robert Rieman
2585 Echo Farms Drive
Port Orange, FL 32128

e. 2021 Ford F150 Crew Cab Lariat EcoBoost 4WD – (10/5/21)
VIN#: 1FTFW1E83MKE21699
Purchaser: Robert James Craiglow
8626 SE 137th Loop
Summerfield, FL 34491.

(Collectively, the "Vehicles").

In due course the lenders discovered that the purchase was made through the buyer's use of either a fake or stolen identity, and no payments on the credit agreement were forthcoming from the "purchasers." Based on the contractual relationship between Benoit and the various third-party lenders (i.e. – Ford Motor Credit, U.S. Bank N.A., Nissan Motor Acceptance Company, and PNC Bank), the lenders required Benoit to purchase or assume each contract and repay the purchase price.

At all relevant times, Benoit alleges that they maintained insurance for these commercial crimes under multiple policies, including the policy issued by Allied World. Allied World issued a Commercial Package Policy that includes Commercial Crime

Coverage (the "Commercial Crime Policy"), which Benoit alleges provides coverage for the loss suffered from the theft of the vehicles. Benoit complains that Allied World denied coverage.

## RULE 12(b)(6) STANDARD

Rule 12(b)(6) allows for dismissal when a plaintiff "fail[s] to state a claim upon which relief can be granted." When reviewing such a motion, the court should focus on the complaint and its attachments. *Wilson v. Birnberg*, 667 F.3d 591, 595 (5th Cir. 2012). The court can also consider documents referenced in and central to a party's claims, as well as matters of which it may take judicial notice. *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498–99 (5th Cir. 2000); *Hall v. Hodgkins*, 305 Fed. App'x 224, 227 (5th Cir. 2008) (unpublished).

Such motions are reviewed with the court "accepting all well-pleaded facts as true and viewing those facts in the light most favorable to the plaintiff." *Bustos v. Martini Club, Inc.*, 599 F.3d 458, 461 (5th Cir. 2010). However, "the plaintiff must plead enough facts 'to state a claim to relief that is plausible on its face.'" *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Accordingly, the court's task is not to evaluate the plaintiff's likelihood of success but instead to determine whether the claim is both legally cognizable and plausible. *Lone Star Fund v. (U.S.), L.P. v. Barclays Bank PLC*, 594 F.3d 383, 387 (5th Cir. 2010).

## **LAW AND ANALYSIS**

Allied World argues that the claims against it must be dismissed because (1) there is no coverage under the plain language of the policy and/or (2) the policy excludes coverage.

*Coverage under the policy*

There are seven Insuring Agreements in the Commercial Crime Coverage form that cover losses caused by various commercial crimes:

1. **Employee Theft**

    We will pay for loss of or damage to "money", "securities" and "other property"
    resulting directly from "theft" committed by an "employee", whether identified or
    not, acting alone or in collusion with other persons.
    For the purposes of this Insuring Agreement, "theft" shall also include forgery.

2. **Forgery Or Alteration**

    a. We will pay for loss resulting directly from "forgery" or alteration of checks, drafts, promissory notes, or similar written promises, orders or directions to pay a sum certain in "money" that are:

        (1) Made or drawn by or drawn upon you;
        or
        (2) Made or drawn by one acting as your agent;
        or that are purported to have been so made or drawn.
        For the purposes of this Insuring Agreement, a substitute check as defined in the Check Clearing for the 21st Century Act shall be treated the same as the original it replaced.

        b. If you are sued for refusing to pay any instrument covered in Paragraph 2.a., on the basis that it has been forged or altered, and you have our written consent to defend against the suit, we will pay for any reasonable legal expenses that you incur and pay in that defense. The amount that we

will pay for such legal expenses is in addition to the Limit of Insurance applicable to this Insuring Agreement.

3. **Inside The Premises – Theft Of Money And Securities**

   We will pay for:

   a. Loss of "money" and "securities" inside the "premises" or "financial institution premises":
       (1) Resulting directly from "theft" committed by a person present inside such "premises" or "financial institution premises"; or
       (2) Resulting directly from disappearance or destruction.
   b. Loss from damage to the "premises" or its exterior resulting directly from an actual or attempted "theft" of "money" and "securities", if you are the owner of the "premises" or are liable for damage to it.
   c. Loss of or damage to a locked safe, vault, cash register, cash box or cash drawer located inside the "premises" resulting directly from an actual or attempted "theft" of, or unlawful entry into, those containers.

4. **Inside The Premises – Robbery Or Safe Burglary Of Other Property**

   We will pay for:

   a. Loss of or damage to "other property":
       (1) Inside the "premises" resulting directly from an actual or attempted "robbery" of a "custodian"; or
       (2) Inside the "premises" in a safe or vault resulting directly from an actual
   or
   attempted "safe burglary".
   b. Loss from damage to the "premises" or its exterior resulting directly from an actual or attempted "robbery" or "safe burglary" of "other property", if you are the owner of the "premises" or are liable for damage to it.
   c. Loss of or damage to a locked safe or vault located inside the "premises" resulting directly from an actual or attempted "robbery" or "safe burglary".

5. **Outside The Premises**

We will pay for:

> a. Loss of "money" and "securities" outside the "premises" in the care and custody of a "messenger" or an armored motor vehicle company resulting directly from "theft", disappearance or destruction.
> b. Loss of or damage to "other property" outside the "premises" in the care and custody of a "messenger" or an armored motor vehicle company resulting directly from an actual or attempted "robbery".

6. **Computer And Funds Transfer Fraud**

   a. We will pay for:

   (1) Loss resulting directly from a fraudulent:
   (a) Entry of "electronic data" or "computer program" into; or
   (b) Change of "electronic data" or "computer program" within; any "computer system" owned, leased or operated by you, provided the fraudulent entry or fraudulent change causes, with regard to Paragraphs 6.a.(1)(a) and 6.a.(1)(b):
      (i) "Money", "securities" or "other property" to be transferred, paid or delivered; or
      (ii) Your account at a "financial institution" to be debited or deleted.
   (2) Loss resulting directly from a "fraudulent instruction" directing a "financial institution" to debit your "transfer account" and to transfer, pay or deliver "money" or "securities" from that account.

   b. As used in Paragraph 6.a.(1), fraudulent entry or fraudulent change of "electronic data" or "computer program" shall include such entry or change made by an "employee" acting, in good faith, upon a "fraudulent instruction" received from a computer software contractor who has a written agreement with you to design, implement or service "computer programs" for a "computer system" covered under this Insuring Agreement.

7. **Money Orders And Counterfeit Money**

We will pay for loss resulting directly from your having, in good faith, accepted in exchange for merchandise, "money" or services:

> a. Money orders issued by any post office, express company or "financial institution" that are not paid upon presentation; or
> b. "Counterfeit money" that is acquired during the regular course of business. [5]

---

[5] Defendant's Exhibit A, Policy, p. 123 – 125.

Allied World complains that Benoit does not specifically allege which one of these seven insuring agreement provisions covers it claims, nor does Benoit address the relevant exclusions in the policy.

As stated by the Louisiana Supreme Court, the essential purpose of insurance "is to afford the insured protection from damage," and "[i]nsurance contracts therefore, should be interpreted to effect, not deny, coverage." *Peterson v. Schimek*, 729 So.2d 1024, 1028 (La. 3/2/99). "An insurance policy is a contract between the parties and should be construed by using the general rules of interpretation of contracts set forth in the Civil Code." *Louisiana Ins. Guar. Ass'n v. Interstate Fire & Cas. Co.*, 630 So.2d 759, 763 (La. 1994) (citing *Smith v. Matthews*, 611 So.2d 1377, 1379 (La. 1993)). "The parties' intent as reflected by the words in the policy determine the extent of coverage." *Louisiana Ins.*, 620 So.2d at 763 (citing *Trinity Industries, Inc. v. Ins. Co. of North America*, 916 F.2d 267, 269 (5th Cir. 1990)). Such intent should be determined in accordance with the general, ordinary, plain and popular meaning of the words used in the policy. *Id.* (citing La. C.C. art. 2047).

If after applying the general rules of construction any ambiguity remains, the ambiguous provision is to be construed against the drafter, or in the context of an insurance contract, in favor of the insured. *Id.* at 764. "This rule of strict construction requires that ambiguous policy provisions be construed against the insurer who issued the policy and in favor of coverage to the insured." *Id.* (citing *Smith*, 611 So.2d at 1379); see also La. C.C. art. 2056 (providing for adverse construction against the author of the text and the party presenting a standard form contract).

"When determining whether or not a policy affords coverage for an incident, it is the burden of the insured to prove the incident falls within the policy's terms." *Doerr v. Mobil Oil Corp.*, 774 So. 2d 119, 125, p. 5 (La. 12/19/00), *modified on other grounds*, 782 So. 2d 573 (La. 3/16/01), (citations omitted). But "[t]he insurer has the burden to prove policy exclusions." *Mistich v. Weeks*, 107 So. 3d 1, 5, p. 5 (La. App. 3 Cir. 7/13/12),; see also *United Specialty Ins. Co. v. Sandhill Prod. Inc.*, 2021 WL 1082224, at *5 (W.D. La. Mar. 17, 2021) (Foote, J.).

Benoit maintains that the policies "provides coverage for the losses suffered by [Benoit] resulting from the theft of the Vehicles."[6] Allied World maintains that Benoit has failed to allege any policy provision that would afford coverage for the vehicle thefts, therefore, the policy does not provide coverage.

Allied World argues that the insuring agreements do not provide coverage for property loss sustained directly by the Insured, rather they provide specified coverage for claims made against the Insured, such as lawsuit or pre-suit demands for money.

Benoit argues that the Forgery or Alteration provision provides coverage for the vehicle theft;[7] that provision expressly states:

> a. We will pay for loss resulting directly from "forgery" or alteration of checks, drafts, promissory notes, or similar written promises, orders, or directions to pay a sum certain in "money" that are:
>
>    (1) Made or drawn by or drawn upon you:
>    (2) Made or drawn by one acting as your agent.[8]

---

[6] First Amended Complaint, ¶ 27, Doc. 56.
[7] Because Plaintiffs do not argue that the other six (6) Insuring agreements provide coverage, the Court will not address these provisions.
[8] Defendant's exhibit A, p. 1 of Commercial Crime Coverage Form (Loss sustained Form), Doc. 27-2.

Benoit asserts that the vehicles were purchased through fraudulent buyers' execution of, among other things, a Retail Installment Contract with Plaintiffs.[9] The policy defines "forgery" to be "the signing of the name of another person or organization with the intent to deceive."[10] Benoit argues that the allegations of the First Amended Complaint, falls within the policy language because the fraudulent buyers "signed the name of another person . . . with the intent to deceive," in the Retail Installment Contract, which reflects a "written promise ... to pay a sum certain in 'money.'" Thus, Benoit maintains that the First Amended Complaint states a plausible claim for recovery under the plain language of this provision.

Allied World argues that Benoit has not alleged sufficient facts to show that its losses are covered under the Forgery and Alteration provisions of the Commercial Crime coverage form. As noted by Allied World, losses resulting "from 'forgery' or alteration of checks, drafts, promissory notes, or similar written promises, orders or directions to pay a sum certain in 'money' involve instruments that are: (1) made or drawn by or drawn upon [Benoit] or (2) made or drawn by one acting as [Benoit's] agent."[11]

Allied World relies on Fifth Circuit authority interpreting nearly identical insurance provisions and holding that the terms "made," "drawn by," and "drawn upon" should be interpreted in the context of commercial paper laws. See *Parkans Int'l LLC v. Zurich Ins. Co.*, 299 F.3d 514, 517 (5th Cir. 2002) (applying Texas's commercial paper law, which gives these terms a "definite legal meaning," to similar forgery and alteration provision

---

[9] Plaintiffs' exhibit A.
[10] Doc. 27-1, p. 12.
[11] Defendant's exhibit A, p.123.

because it includes words like "checks, drafts, and promissory notes"); *Travelers Cas. & Sur. Co. of Am. v. Baptist Health Sys.*, 313 F.3d 295, 299 (5th Cir. 2002) (same).

Benoit has made newly alleged facts about the retail contracts. In the First Amended Complaint, Benoit alleges that "the prospective buyer purchased the vehicle online with a credit application submitted to the respective lender."[12] Then, "the lenders send Benoit payment for the vehicle and the buyer arranges transport."[13] And it was the "respective lenders" who "later determined that the Vehicles were stolen and that no payments would be made on the financing agreements."[14]

First, Benoit has not established that the installment contracts are "checks, drafts, promissory notes, or similar written promises, orders or directions to pay a sum certain in 'money,' as contemplated by Forgery or Alteration provision.[15] But even if they are, under Benoit's newly alleged retail installment contract theory, the contracts were drawn upon **the lenders** because the lenders were ordered to make payment to Benoit.[16] The retail installment contracts were not drawn or made by or upon Benoit, as required for the Forgery or Alteration provision to apply. If anything, Benoit's new allegations that the bad actors used retail contracts to steal the vehicles, and not bad checks, reinforces the applicability of *Parkans*. As in *Parkans*, here the alleged instrument identifies the drawee as the bank, not the insured.[17] ("the lenders send Plaintiffs payment for the vehicle");

---

[12] Doc. 42-1 ¶7.
[13] Id. ¶8.
[14] Id. ¶10.
[15] Defendant's exhibit A, p. 123.
[16] Doc. 42-1 ¶8.
[17] Doc. 42-1 ¶8.

*Parkans*, 299 F.3d at 517 ("The letter of credit itself identifies the drawee as the 'Advising Bank,' i.e., . . . not [the insured]).")

Benoit also argues that the Forgery and Alteration provision is ambiguous because the Policy does not define the terms "made," or "drawn by," or "drawn upon," however, the Louisiana Commercial Code does. See, e.g., *Parkans*, 299 at 517 (applying Texas's commercial paper law, which gives these terms a "definite legal meaning," to similar forgery and alteration provision because it includes words like "checks, drafts, and promissory notes"); *Travelers*, 313 F.3d at 299. Louisiana Revised Statute 10:3-103(a) defines "maker" as a person who "signs or is identified in a note as a person undertaking to pay"; a "drawer" as a person who "signs or is identified in a draft as a person ordering payment"; and a "drawee" as a "person ordered in a draft to make payment." Louisiana Revised Statute 10:3-103(a). Thus, as used in the Forgery and Alteration provision, "make" means to sign or undertake an obligation to pay; "draw" means to order payment; and "drawn upon" means to be ordered to make a payment.

Benoit does not allege that the "bad actors" were acting on behalf of Benoit.[18] And here, the lender is the drawee.  Moreover, Benoit, did not order that a payment(s) be made. Benoit was the payee.

As such, Plaintiffs have failed to show that its losses were caused by a check "made or drawn by or drawn upon" by Benoit and Benoit's theory regarding the installment contract likewise fails because the lenders were the payor and Benoit was the payee.

---

[18] See Petition, ¶ 11, Doc. 1-2 which alleges that the bad actors were part of an "organized outfit."

Plaintiffs' First Amended Complaint does not allege that any checks, drafts, promissory notes, or similar written promises, orders, or directions to pay a sum certain in "money" were made or drawn by or drawn upon Benoit or made or drawn by one acting as Benoit's agent. The Court finds that the Forgery or Alteration provision is not a covered claim for the allegations made in First Amended Complaint.

*Exclusion*

Defendant argues that Benoit's claims are excluded under the policy. The insuring agreements also include the following pertinent exclusion:

> **D. Exclusions**
>
> 1. This insurance does not cover:
> ***
> d. Confidential or Personal Information
> Loss resulting from
> (1) The disclosure or use of another person's or organization's confidential or personal information; or
> (2) The disclosure of your confidential or personal information. . . .
> For the purposes of this exclusion, confidential or personal information includes, but is not limited to, patents, trade secrets, processing methods, customer lists, financial information, credit card information, health information or any other type of nonpublic information.

The Commercial Crime provision provides an exclusion for "Confidential or Personal Information." The exclusion eliminates coverage for "loss resulting from [t]he . . . use of another person's . . . personal information".[19] Benoit alleges that its vehicles "were fraudulently purchased by a bad actor(s) that engaged in identity theft" and that "assum[ed] [their] stolen identit[ies]."[20]

---

[19] Defendant's exhibit A, p. 125.)
[20] Doc. 1-2, Petition, ¶ 9.

The bad actors used other people's identities, including their names and financial information, when submitting a credit application and other miscellaneous paperwork to fraudulently purchase the vehicles. Exclusion 1.d itself lists the types of information that are considered "personal and confidential" for the purpose of the exclusion and "includes, but is not limited to," everything from "patents" to "financial information, credit card information . . . or any other type of nonpublic information."[21] The policy provision unambiguously excludes coverage for the loss resulting from the use of another person's personal information as was done here. As such the Court finds that the policy expressly excludes coverage for the claims alleged in the First Amended Complaint.

## CONCLUSION

For the reasons explained herein, the Court will grant Allied World Specialty Insurance Company's Motion to Dismiss" (Doc. 27). Benoit's First Amended Complaint does not cure the defects—or absence of coverage—due to the policy exclusion and this Court's interpretation of the Forgery or Alteration coverage provision. Consequently, the Court agrees with Allied World that any further amendment would be futile, and thus, Allied World will be dismissed with prejudice.

**THUS DONE AND SIGNED** in Chambers on this 22nd day of September, 2023.

JAMES D. CAIN, JR.
UNITED STATES DISTRICT JUDGE

---

[21] Defendant's exhibit A, p. 125.